**NOT FOR PUBLICATION** **CLOSED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID BERESFORD, | : |
| Plaintiff, | : Civil Action No. 08-2236 (JAP) |
| v. | : **OPINION** |
| WALL TOWNSHIP BOARD OF EDUCATION and JAMES HABEL, individually and in his capacity as Superintendent of the Wall Township Board of Education, | : |
| Defendants. | : |

PISANO, District Judge.

Plaintiff, David Beresford ("Beresford"), brought this action against defendants Wall Township Board of Education ("Board") and its Superintendent James Habel ("Defendants") for wrongful discharge stemming from his termination as Manager of Information Services in the Defendants' technology department. Plaintiff's claims are based on New Jersey's Law Against Discrimination ("NJLAD"), and he further alleges violations of his right to freedom of speech and association guaranteed by the First and Fourteenth Amendments of the United States Constitution. In addition, Beresford has brought claims of intentional and negligent infliction of emotional distress, as well as a violation of public policy. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

Presently before the Court is a motion for summary judgment filed by the Defendants. The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure

1

78.  For the reasons set forth herein, the Court grants the Defendants motion for summary judgment.

> I. **Background**

In February 1998, the Board hired David Beresford as their Manager of Information Services. Def.'s & Pl.'s Stmt. of Mat. Undisputed Facts, ¶ 7. Beresford's position throughout his employment was a non-tenured position, and he concedes that he was never eligible for tenure. *Id.* ¶ 8. In July of 1998, the Board hired Jeff Janover as the Director of Technology who supervised Beresford. *Id.* ¶¶ 9-10. Under Janover, Beresford received no negative performance reviews with the exception of some minor complaints which were later resolved. *Id.* ¶ 11.

In May or June 2004, Beresford started conversing with fellow IT department employees about forming a union. *Id.* ¶ 16. On October 27, 2004, the IT employees, excluding Janover, formally sought recognition of their bargaining unit, the Wall Township Information Technology Association ("WITA"), which was granted three weeks later by the Board. *Id.* ¶¶ 17-18. Beresford became the head negotiator on behalf of WITA. *Id.* ¶ 19. In November 2004, Plaintiff began negotiations to create an IT department employment contract which detailed the roles that each employee played in the department, raises, sick day allotments and overtime. *Id.* ¶ 20. Negotiations eventually broke down and an impasse was filed in June 2005. *Id.* ¶ 25. Subsequently, in September 2005, Beresford fell and fractured his tibia and was out on medical leave. *Id.* ¶ 21. Between September 2005 and January 2006, Beresford did not participate in the union negotiations. *Id.* ¶ 14. Finally, in June 2006, the parties reached a tentative agreement which was subsequently rejected by the Board's three-to-three vote. *Id.* ¶¶ 26-27.

Thereafter, a mediator, Gerard Restaino, was appointed to review the rejected agreement and make recommendations. *Id.* ¶¶ 28-29. In his recommendations, Restaino rejected

Beresford's proposal for an increased salary and seniority over all employees in the IT group. *Id*. ¶¶ 30-32. Beresford participated in union negotiations until March 28, 2007 when he resigned from his position with WITA due to health concerns. *Id*. ¶¶ 33-34.

Beresford now claims that he was harassed, threatened and discriminated against during the negotiation process. *Id*. ¶ 35. But he never reported any of the harassment, threats or discrimination to Human Resources because he had never seen a policy regarding how to make or file a complaint. *Id*. ¶ 36. In pointing to particular instances, Beresford believed that Defendants threatened termination of his employment through the firing of Ms. Murphy, a technician in the IT department who voted against the proposed employment contract. *Id*. ¶ 37. Beresford considered the termination of Ms. Murphy to be an implied threat to all employees in the department to sign the contract or be fired. *Id*. ¶ 38. While Beresford believed Ms. Murphy was terminated due to her union activity, Janover has testified that Ms. Murphy was terminated due to poor performance, difficulty with the dress code and a general negative demeanor. *Id*. ¶¶ 40-41.

In addition to Ms. Murphy's termination, Beresford felt his job was openly threatened by Superintendent Habel during negotiations. *Id*. ¶ 42. Beresford testified that Habel stated that "maybe we ought to start looking at people's attendance records for people who have been out a long time and maybe we don't need those people." *Id*. ¶ 43. In light of his medical absences, Beresford took these words to be a threat to his continued employment. *Id*. ¶ 43. Beresford testified that there were no other specific threats during this negotiation timeframe, but in general there were other "bits of harassment" going on in the department. *Id*. ¶¶ 45-46. For example, during the negotiation process, the technology department's parking privileges were moved from the main parking lot to the back of the building, which was a closer proximity to the offices but

caused Plaintiff to have to walk 150 feet to the front of the building instead of ten feet. *Id*. ¶¶ 46-47.  Additionally, Beresford perceived there was a pattern of harassment when an employee was promised compensation time that was denied by Habel; Beresford himself specifically never made a request for compensation time. *Id*. ¶¶ 50-52.  Further, as part of the alleged pattern of harassment, Beresford was denied reimbursement for his mileage for a paid professional day for a conference in Atlantic City. *Id*. ¶¶ 53-56.  Although Janover claimed the denial was due to the fact that mileage is not typically reimbursed to employees, Beresford believed this to be an act of harassment as he had previously in 2006 been reimbursed for mileage when asked to drive other employees to a conference in Newark. *Id*. ¶ 57.  Additionally, Beresford felt threatened on at least five unspecified occasions when Janover told members of WITA that they needed to settle negotiations as soon as possible because they had angered the other side and they "wouldn't like the results." *Id*. ¶ 58.  Finally, Beresford noted discussions about the entire IT department being outsourced which he perceived as a threat. *Id*. ¶ 60.

In addition to these threats and the pattern of harassment, Beresford also believed he was discriminated against because of his out of the office time due to medical conditions. *Id*. ¶ 62.  In 1999, Beresford had a heart attack which put him on medical leave from February 1999 to April or May 1999. *Id*. ¶ 64.  When Beresford returned to work, he was unable to lift anything heavy but could perform all aspects of his job without any other accommodations. *Id*. ¶ 66.  In June 2000, Beresford had additional stents put in his heart and required a few days off of work and an accommodation restricting the lifting of heavy objects which was provided by the Board. *Id*. ¶ 68.  In September 2005, Beresford broke his leg and took medical leave until January 2006. *Id*. ¶ 70.  Upon return to work, Beresford could not lift heavy objects, could not sit at his desk for long periods of time, could not stand for long periods of time, and needed to attend physical

therapy.  *Id*. ¶ 71.  All accommodations were granted by the Board.  *Id*. ¶ 72.  Despite these accommodations, Beresford felt discriminated when Janover who was also injured at the time commented that if he could come into work, he didn't understand why Plaintiff could not.  *Id*. ¶ 75.  Additionally, Beresford felt that Janover discriminated against him and harassed him by giving him more job duties in his role as a Manager of Information Systems because his heart condition was deteriorating.  *Id*. ¶¶ 77-78.

In 2006, Janover at the Board's request conducted an analysis to identify positions from the IT department that could be eliminated pursuant to a reduction in force due to budgetary limitations.  *Id*. ¶ 81.  The Board was required to reduce its workforce as a result of the imposition of restrictions from the State's four percent budget cap.  *Id*. ¶ 82.  In order to find the highest cost-to-benefit ratio, Janover considered each job description and its salaries.  *Id*. ¶ 83.  His final conclusion was that the Manager of Information System position should be eliminated.  *Id*. ¶ 84.  On May 9, 2007, the Board notified Beresford that his position had been eliminated for budgetary reasons in accordance with N.J. Stat. Ann. § 18A:27-9.  *Id*. ¶ 86.  Beresford believed that the termination of his position for budgetary reasons was simply a pretext for discrimination.  *Id*. ¶¶ 83-87.  During the 2008-2009 school year, the Board reduced its entire workforce by twenty-three individuals and in the 2009-2010 school year the workforce was reduced by an additional sixty positions due to budgetary constraints.  *Id*. ¶ 89.

On April 10, 2008, Plaintiff filed a seven-count complaint in the Superior Court of New Jersey, Law Division, Monmouth County, claiming harassment and retaliation under NJLAD and violations of his freedom of speech and association guaranteed by the First and Fourteenth Amendments of the United States Constitution.  In addition, Beresford has brought claims of intentional and negligent infliction of emotional distress and a violation of public policy.  On

May 8, 2009, the case was removed to the United States District Court pursuant to 28 U.S.C. § 1446(b).

II. **Discussion**

    a. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must establish "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The district court must determine whether disputed issues of material fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

In determining whether a genuine issue of material fact exists, the court must view the facts in the light most favorable to the non-moving party and extend all reasonable inferences to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Stephens v. Kerrigan*, 122 F.3d 171, 176-77 (3d Cir. 1997). The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact, regardless of which party ultimately would have the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id*. at 324. Thus, the non-moving party may not rest upon the mere allegations or denials of its pleadings. *Id*. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

Once the moving-party has demonstrated to the court the absence of a material fact at issue, the Supreme Court has stated that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ." *Matsushita*, 475 U.S. at 586-87 (citations omitted). In other words, "[i]f the evidence [submitted by the non-moving party] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The Supreme Court has specifically recognized that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses, and [] that [the rule] should be interpreted in a way that allows it to accomplish this purpose." *Celotex*, 477 U.S. at 323-24. Thus, "[w]hen the record is such that it would not support a rational finding that an essential element of the non-moving party's claim or defense exists, summary judgment must be entered for the moving party." *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 341 (3d Cir. 1990).

  b. Analysis

  i. **Federal Law Claims: Violations of the First Amendment**

Plaintiff Beresford alleges a 42 U.S.C. § 1983 violation against Defendants based on his First Amendment right to freedom of speech and freedom of association. Generally speaking, a public employee has a constitutional right to speak on matters of public concern without fear of retaliation. *Rankin v. McPherson*, 483 U.S. 378, 383-94 (1987); *Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 829 (3d Cir. 1994). A public employee's claim for retaliation for engaging in protected speech follows a three-step process. *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997). First, plaintiff must establish the speech in question was protected. *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001). Second, the plaintiff must show that the

7

protected activity was a substantial or motivating factor in the alleged retaliatory action. *Id*. Lastly, if the first two prongs are met, the public employer can rebut the claim by demonstrating that "it would have reached the same decisions . . . even in the absence of the protected conduct." *Id*. (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Determining whether speech is protected is a question of law for the court; however, the second and third prong of the analysis present questions of fact to be determined by the fact-finder only if a *genuine* question of fact exists. *Id*.; *see also Hill v. City of Scranton*, 411 F.3d 118, 127 (3d Cir. 2005) (noting that in order to survive a motion for summary judgment there must be a genuine issue of fact for the jury, i.e., a plaintiff must establish sufficient evidence that would permit a reasonable jury to conclude that such speech was a substantial factor in plaintiff's termination).

For the first prong, a public employee's statement is protected speech when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made [i.e., the *Pickering* balancing test]." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). A public employee who makes statements pursuant to their official duties is not speaking "as a citizen" for First Amendment purposes and therefore such speech is not protected by the First Amendment. *Garcetti*, 547 U.S. at 421. Further, the determination of whether an employee's speech is a matter of public concern is based on "'the content, form and context of a given statement, as revealed by the whole record.'" *Hill*, 455 F.3d at 242 (quoting *Rankin*, 483 U.S. at 384). Generally speaking, "a public employee's speech involves a matter of public concern if it can be fairly considered as relating to

any matter of political, social or other concern to the community." *Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003). Moreover, public speech cannot "constitute merely personal grievances." *Id*. (quoting *Feldman v. Phila. Housing Auth.*, 43 F.3d 823, 829 (3d Cir. 1994). The right to freedom of speech under the First Amendment extends broadly over union activities as matters of public concern. *Crane v. Yurick*, 287 F. Supp. 2d 553, 560 (D.N.J. 2003). The Third Circuit, however, has been careful to limit such broad insulation when the speech involves employee's personal complaints about their employment and does not seek to inform the public that the government discharged its responsibilities or to bring to light the government's breach of public trust. *Gaj v. United States Postal Service*, 800 F.2d 64, 67 (3d Cir. 1986).

In addition to a First Amendment freedom of speech claim, Plaintiff also argues that the Defendants violated the Plaintiff's right to freedom of association for allegedly retaliating against Plaintiff due to his union activities. Generally speaking, public employees do not forgo the exercise of the right to freedom of association. *Rode v. Dellarciprete*, 845 F.2d 1195, 1204 (3d Cir. 1988). As with a freedom of speech claim, an employee who raises an adverse employment action based upon the exercise of their associational rights must show that he was engaged in a constitutionally protected activity and that such conduct was a substantial and motivating factor of the plaintiff's termination. *Id*. (citing *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287). While the activity in question must be protected, the Third Circuit has recognized but not addressed the fact that there is a circuit split as to whether the freedom of association claims are governed by the "public concern" requirement. *Sanguigni v. Pittsburgh Bd. of Pub. Educ.*, 968 F.2d 393, 400 (3d Cir. 1992).

In this case, Plaintiff has not shown a violation of his First Amendment rights to free speech because Plaintiff's speech was not protected. First, Plaintiff was not acting as a private

citizen when engaging in speech as a public employee and President of the WITA union because such speech was performed while Plaintiff was in his official capacity as negotiator of his union. Second, Plaintiff was not speaking on a matter of public concern as his speech did not relate to "any matter of political, social or other concern to the community." In fact, Beresford's speech involved his own personal demands and complaints in addition to the grievances of a few members of his WITA union. Plaintiff admits that his contractual negotiations were related to his and the WITA members' employment, raises, sick days and overtime. Def.'s & Pl.'s Stmt. of Mat. Undisputed Facts, ¶ 20. Further, the point of contention in negotiations with the Board only related to the personal matter of giving Beresford "super-seniority" over the team and an increased salary. *Id*. ¶¶ 30-32. Although union-related speech is generally a matter of public concern, the union-related speech in this case does not rise to such a level as it relates only to the employee's generalized personal grievances and gain. Additionally, the speech was not engaged in with the purpose of informing the public that the government discharged its responsibilities or of bringing to light the government's breach of public trust. Without a finding that Plaintiff's speech was a matter of public concern and engaged in as a private citizen, the first prong for a violation of Plaintiff's First Amendment's right of freedom of speech is not satisfied.

Notwithstanding the fact that Plaintiff's speech was not protected, Plaintiff's claim for retaliation based on freedom of speech also fails because he has not presented a genuine issue of fact as to the second prong. Plaintiff has not shown that his union-speech activity was a substantial or motivating factor in the alleged retaliatory action. Specifically, Plaintiff bases his First Amendment retaliation claim on the firing of an IT employee with performance issues; Plaintiff's perceived threat by Habel to review the department's attendance records; the Defendant's moving of the department's parking spots; Defendant's change in policy regarding

compensation time and mileage reimbursement; and Janover telling members of the union that negotiations needed to settle as soon as possible.  These allegations on their own and considered cumulatively do not rise to the level of showing that Plaintiff's union speech was a substantial or motivating factor in his termination because at best these allegations are administrative changes not directed at Beresford or Beresford's own perception of the significance of statements or events.

Additionally, Beresford has failed to overcome the Defendant's justification for his firing due to budgetary constraints.  Defendants have offered evidence that four departmental positions were eliminated in 2007, twenty-three other positions in the district were eliminated in the 2008-2009 school year, and sixty positions were eliminated during the 2009-2010 school year.  Plaintiff's only argument in response to these facts is that he would have been terminated regardless of the reduction in force and that the reduction in force was a pretext to fire him.  Pl.'s Opp. Br. at 4.  Considering the scope of the reduction in force and the weak allegations set forth by Plaintiff as to his retaliation argument, it is difficult to imagine that the Board eliminated eighty-seven positions as a pretext for firing Plaintiff.  Therefore, Plaintiff has failed to show that his activity and speech with the WITA union acted as a motivating or substantial factor in his termination.  As there is no issue of genuine fact for a reasonable jury to decide, the second-prong of the freedom of speech analysis is not satisfied.

Further, Plaintiff's freedom of association claim mirrors his freedom of speech claim in that it relates to the same union speech and attendant circumstances.  Similarly, Plaintiff has also failed to support a claim for his First Amendment right to freedom of association because he has failed show that his involvement in the WITA union was a substantial or motivating factor in the alleged retaliatory action.  Regardless of whether the "public concern" requirement applies,

11

Beresford would be unable to substantiate a claim for a violation of his right to freedom of association. Therefore, summary judgment is granted to Defendants as to all First Amendment claims.

### ii. **State Law Claims: NJLAD, Tort & Public Policy Violations**

Plaintiff's main allegation consists of claims of discrimination under NJLAD based on retaliation and harassment by Defendants 1) due to Plaintiff's health issues and 2) through the creation of a hostile work environment in response to Plaintiff's involvement in union activity. Under NJLAD, an employer is prohibited from discharging any employee by discriminating against the individual with respect to his race, color, religion, sex, disability or national origin. N.J. Stat. Ann. § 10:5-12(a). NJLAD states that it shall be employment discrimination for an employer to take reprisals against any person because he has opposed any practices or acts forbidden under this act or assisted in any proceeding under this act. N.J. Stat. Ann. § 10:5-12(d). In order to establish a prima facie case of retaliation under NJLAD, a plaintiff must show that 1) he engaged in a protected activity known to the defendant, 2) he was thereafter subjected to an adverse employment decision by the defendant, and 3) there was a causal link between the two. *Romano v. Brown & Williamson Tobacco Corp.*, 284 N.J. Super. 543, 548-49 (App. Div. 1995).

Plaintiff has failed to establish a valid claim under NJLAD either for retaliation based on his medical condition or due to his union activities. First, there is no factual connection between Plaintiff's medical condition and his termination that would give rise to a causal link between the two. Specifically, Plaintiff's medical conditions did not relate temporally to his termination in 2007 as his heart problems began in 1999 and 2000 and his broken leg occurred in 2005 and 2006. Further, the Board willingly made any and all necessary accommodations for Plaintiff's

conditions.  In regards to retaliation based on Plaintiff's union activity, Plaintiff has not established that involvement in union activities is included as a protected activity under NJLAD.  As such, Plaintiff cannot substantiate a claim under NJLAD for retaliation.

Furthermore, Plaintiff has not stated valid claims for intentional or negligent infliction of emotional distress.  Defendants' termination of an at-will employee and Plaintiff's allegations that led up to his termination do not rise to conduct so outrageous in character to go beyond all possible bounds of decency to constitute intentional infliction of emotional distress.  Further, a claim for negligent infliction of emotional distress fails because Defendants owed no duty to Plaintiff as it was not foreseeable that termination of a non-tenured, at-will employee would cause severe emotional distress.  Finally, Plaintiff has not articulated any sound and relevant violations of public policy.

III.    **Conclusion**

For the reasons set forth above, the Defendants' motion for summary judgment is granted and this case is closed.  An appropriate Order accompanies this Opinion.

/s/ JOEL A. PISANO
United States District Judge

Date: February 3, 2010